Filed 11/19/21  In re Anthony R. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ANTHONY R. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GLORIA R.,<br><br>    Defendant and Appellant. | G060059<br><br>(Super. Ct. Nos. 17DP0095A & 17DP0096A)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Robert J. Gerard, Judge.  Affirmed.

Ronni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Debbie Torrez, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

## INTRODUCTION

Gloria R., the mother of the minors Anthony R. and Layla C., appeals from an order pursuant to Welfare and Institutions Code section 366.26 terminating her parental rights.[1]  She argues on appeal that she presented sufficient evidence to establish the parental benefit exception of section 366.26, subdivision (c)(1)(B)(i).

We affirm the order.  Gloria's evidence supporting the exception was not uncontradicted and unimpeached, as is required when an appellant disputes a trial court's finding that a party did not carry an assigned burden of proof.  Of the three elements of the parental benefit exception, Gloria failed to establish two:  regular visitation and continuing benefit to the children.  The court correctly found that adoption, most likely by Gloria's parents, outweighed the benefit of continuing the children's parental relationship with Gloria.

## FACTS

Anthony and Layla were detained in August 2019 after Gloria took them and herself to a hospital emergency room complaining about a "dog spirit" that was possessing her and the children.  She admitted that she had used methamphetamine that morning.  Anthony was seven years old at the time; Layla was two.  The children were placed with Gloria's mother and her husband.  As it turned out, Gloria's mother had often cared for the children in Gloria's absence.

This was not Gloria's first encounter with Orange County Social Services Agency (SSA).  She tested positive for drugs at Layla's birth in January 2017, and both Layla and Anthony were detained.  The children were returned to Gloria in January 2018, and the dependency was terminated in October.  She admitted beginning to use drugs again in March 2019.  Gloria's mother told SSA that Gloria and Layla's father began using drugs again the day after the first dependency closed (October 2018).

---

[1]  All further statutory references are to the Welfare and Institutions Code.

2

Gloria's mother also reported to SSA in August 2019 that she often cared for the children for between three and seven days at a time, while Gloria was high on drugs. Between March and June of 2019, Gloria and the children were living with her; Gloria would be "gone all day and would leave the children . . . and would then go out at night and would come home whenever she wanted."

The detention hearing took place on August 12, 2019, and the jurisdiction/disposition hearing took place on August 29. Gloria did not appear at either hearing. Gloria's first court appearance took place on March 4, 2020, the six-month review.

Between September 2019 and February 2021, Gloria was often either in jail or in a residential drug treatment program. During these periods, her mother would transport the children for visits. Once the pandemic struck, and Gloria's program went on lockdown, she visited the children through FaceTime. When Gloria was not under supervision, however, she would frequently be absent.

In its report of June 9, 2020, SSA recommended that reunification services be continued. As of September 2, however, SSA was recommending termination of services. By that time, Anthony and Layla had been in foster care for more than a year. Gloria completed her in-patient drug program on June 3, 2020, and promptly began using drugs. She did not meet with her social worker in July, and SSA did not know where she was. She did not communicate with her outpatient case manager or attend her group sessions. She enrolled in a sober living program in February 2021, but was immediately expelled after she and some other enrollees relapsed.

Reunification services were terminated on October 14, 2020. Gloria's parental rights were terminated on March 17, 2021.

Gloria's appeal is limited to one issue. She asserts that the juvenile court erred in finding that the parental benefit exception of section 366.26, subdivision (c)(1)(B)(i) did not apply.

3

## DISCUSSION

Section 366.26 provides the procedure for determining a dependent child's permanent placement. The statute *requires* the juvenile court to terminate parental rights if it finds the child is likely to be adopted *unless* one of the statutory exceptions applies. (§ 366.26, subd. (c)(1).) One of these exceptions is commonly called the parental benefit exception. Even if the child is likely to be adopted, parental rights are not terminated if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent carries the burden of proof of establishing the exception (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, overruled on other grounds *In re Caden C.* (2021) 11 Cal.5th 614) and it is a difficult burden to carry. "The exception requires the parent to prove both that he or she has maintained regular visitation and that his or her relationship with the child ""'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'"" [Citations.]" (*Ibid.*)

Our Supreme Court has recently decided a case, *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), that deals in some detail with the parental benefit exception. As the court pointed out, deciding whether to terminate parental rights does not depend on whether the child will ever be reunited with the parent. In fact, if the dependency case gets as far as a section 366.26 hearing, it is highly unlikely the parent and child would be reunited. But potential reunification is not the criterion for applying the parental benefit exception. (*Caden C., supra,* 11 Cal.5th at pp. 630, 367, 638.) Moreover, the parent's failure to resolve the problems that led to dependency, such as drug use, does not in itself defeat the exception. (*Id.* at p. 637.)

The three elements to the parental benefit exception are (1) regular visitation, (2) a relationship that would continue to benefit the child, and (3) detriment to

4

the child if the relationship is severed.  (*Caden C., supra,* 11 Cal.5th at p. 631.)
Throughout the inquiry, the focus must remain firmly on the child's best interest.  (*Id.* at p.  632.)

It is important to note that the court also endorsed two different standards of review.  Whether the parent has visited regularly and whether continuing the relationship would benefit the child are reviewed for sufficiency of the evidence.  The detriment decision, however, is reviewed for abuse of discretion.  (*Caden C., supra,* 11 Cal.5th at pp. 639-640.)

Gloria relies heavily on *Caden C.* to support her argument that the juvenile court erred in finding the parental benefit exception inapplicable.  There are, however, significant differences between the facts of this case and those of *Caden C.*, facts that support the juvenile court's ruling and will be discussed below.

In addition to factual differences, this case and *Caden C.* differ in another important respect.  The juvenile court in *Caden C.* found that the mother had carried her burden to establish the parental benefit exception.  (*Caden C., supra,* 11 Cal.5th at p. 628.)  A reviewing court would therefore use the substantial evidence test to determine whether substantial evidence, contradicted or uncontradicted, supported the juvenile court's ruling.  (See *In re B.D.* (2008) 159 Cal.App.4th 1218, 1232.)  In this case, however, the juvenile court found that Gloria, who had the burden of proof (see *In re Megan S.* (2002) 104 Cal.App.4th 247, 251), did *not* carry it.  The inquiry at the appellate level therefore takes on a different cast:  "In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.  This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations].

5

[¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds, *Conservatorship of O.B.* (2020) 9 Cal.5th 989 [mother did not present uncontradicted and unimpeached evidence to support parental benefit exception]; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 ["Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed."].)

## I.        Regular Visitation

The *Caden C.* court regarded the regular visitation element of the parental benefit exception as "straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' [Citation.]" (*Caden C., supra,* 11 Cal.5th at p. 632.)[2]

The juvenile court initially provided Gloria with two hours per week of monitored visitation for each child. SSA informed Gloria of the visitation provision sometime before August 22, 2019. As of early September, she had not visited. In April 2020, she was offered 12 hours per week.

Gloria argues that the mother in *Caden C.* visited only once a month, for one hour, and yet this visitation was deemed sufficient to meet the first element. What Gloria fails to acknowledge, however, is that the mother in *Caden C.* was *allowed* only one one-hour visit per month. (*Caden C., supra,* 11 Cal.5th at p. 626.) Gloria, by

---

2        Gloria argues that "consistent" visitation is a standard different from "regular" visitation. We are unable to find support for this interpretation. The Supreme Court seems to us to use the terms interchangeably.

contrast, was allowed, first 2 hours visitation per week, per child, and then, in April 2020, 12 hours of visitation per week. The evidence presented through SSA's reports established that she only occasionally made use of these opportunities.

The evidence submitted at the section 366.26 hearing consisted of two SSA reports and Gloria's testimony. With respect to visitation, she testified she had visited consistently since the case had been opened and she saw the children after work or on her days off. She testified she saw them each week on school days for approximately two hours and on her days off from three to four hours. She also testified that she called them every day. On cross-examination, she admitted she failed to visit consistently for only a month in 2020.

The SSA reports presented evidence of visitation that can best be described as sporadic. Gloria's visitation was most consistent when she was either in jail or in a drug program that she was not allowed to leave. Her mother was diligent about transporting the children to these visits. In fact, this record shows that Gloria regularly visited for the most part when she had nothing else to do or when her mother threatened her with the consequences of not visiting. When she was her own master, however, she would disappear for extended periods or appear only briefly.

In 2020, after she finished her first in-patient program, she reportedly did not visit regularly between June and September, considerably more than a month. She preferred sleeping in to helping Anthony get ready for school in the mornings, and, at one point, after being released from jail in October 2019, she stopped by her mother's home not to see the children but to shower and ask for money.[3]

Gloria's visits were, according to SSA's reports, hit or miss, and the juvenile court so found. For a while she would see the children for a fraction of her allotted time (and spend this time talking to her mother) and then she would visit

---

[3] She stopped in on Anthony's birthday for a brief visit, but left without wishing him a happy birthday. In the fall of 2020, she would sometimes "visit" at 11:00 p.m., when the children were asleep.

religiously for a week. She was staying just four houses away from the children in June 2020, after completing her in-patient drug program, yet, according to her mother, she "rarely [saw] the children." During this time, Layla pointed to the house as being where Gloria lived and remarked that she had not seen her there. In September 2020, Gloria was reported to be visiting "from time to time, but not on a consistent schedule." She was still using drugs, and she was not permitted to visit while she was under the influence.

"Regular" or "consistent" visitation involves conduct over the long run. Bursts of visiting interspersed with extended absences do not "'develop a significant, positive, emotional attachment from child to parent' [citation]" (*Caden C., supra,* 11 Cal.5th at p. 632), especially in a child as young as Layla. The evidence Gloria presented about her visitation was not uncontradicted and unimpeached. It did not compel a finding for Gloria as a matter of law on this element of the parental benefit exception.

## II.          Continuing Benefit

As the *Caden C.* court observed, the continuing benefit element focuses on the child's best interest. "[T]he relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' [Citation.] . . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C., supra,* 11 Cal.5th at p. 632.)

The child in *Caden C.* had lived with his mother until the age of four. (*Caden C., supra,* 11 Cal.5th at p. 626.) At the time of the first section 366.26 hearing, he was nine.[4] (*Id.* at p. 627.) Everyone agreed he had an intense bond with her. In fact,

---

[4]          After the ruling on termination of parental rights was appealed, the juvenile court held another section 366.26 hearing and terminated the mother's rights. The case was therefore moot. Nevertheless, the court retained the case because of the continuing public interest in the issue. (*Caden C., supra,* 11 Cal.5th at p. 629, fn. 3.)

there was some concern that his "preoccupation" with his mother might prevent him from forming other relationships, so continuing the relationship could be detrimental rather than beneficial. (*Id.* at pp. 634-635.)

In this case, Gloria testified at the section 366.26 hearing that Anthony calls her "mom" and Layla calls her "mommy." When she visited, she read with them, helped Anthony with homework, and played with both of them. She testified that both children confided in her and that they were distressed when visits were over. She bought clothes for them and took them out to eat.

The SSA reports painted a different picture. Anthony's relationship with Gloria was shown to be impaired from the start of the dependency proceeding. From the very beginning he stated that he did not want to live with Gloria, that he wanted to stay with his grandparents, whom he called "ma" and "pa," because "they are nice and treat me good, they take me outside to play, they feed me and they love me." He contrasted this treatment with Gloria's sleeping all day, yelling at him, and making him clean up. He told SSA he was afraid of Gloria, and he resented being forced to take over his mother's duties in caring for Layla after she was born, "while [Gloria] just sleeps." Anthony refused to visit Gloria in jail. He was "OK" with not seeing Gloria when she did not appear.

Anthony's therapist reported that he referred to his grandparents as mom and dad and called his mother "Gloria." The therapist opined that "this is his way of detaching himself from his mother." The SSA report of March 4, 2020, remarked that "[i]t has been observed that the children refer to their mother as Gloria." The social worker testified at the 12-month review hearing that Anthony "has always referred to her [as 'Gloria'] and that his caregiver is his mom." There is no instance in any SSA report of Layla calling Gloria "mommy."

9

By the time of the section 366.26 hearing, Anthony was nine. He was old enough to understand what Gloria's drug use and frequent abandonment meant.[5] He was making progress in therapy to overcome impulsive and aggressive behaviors and improve his coping skills. As stated above, Gloria declined to see him in the morning to help him get ready for school because she wanted to sleep in. He told SSA he was open to adoption and he did not want to live with Gloria.[6] He preferred to stay with "ma" and "pa."

Although the failure to overcome the circumstances leading to dependency, such as drug use, is not in itself a bar to the application of the parental benefit exception, the failure is relevant to the continuing benefit element in that "the parent's struggles speak to the benefit (or lack thereof) of continuing the relationship." (*Caden C., supra,* 11 Cal.5th at p. 638.) Gloria's inability to stay sober unless she is in jail or under strict supervision speaks to the benefit of continuing her relationship with Anthony. Visiting her in jail was traumatic for Anthony, and her disappearances when she is under the influence cannot by any means be considered beneficial to him.

As for Layla, she was two years old in August 2019 when she was placed with her grandparents, whom she called "mama" and "papa." She was detained at birth, in 2017, and was not returned to Gloria's care until January 2018, a year later. Between the time the first dependency proceeding closed in October 2018 and the second detention – less than a year – Layla had already spent a good deal of time with her grandparents while Gloria was off doing other things. By the time of the termination hearing in March 2021, Layla was four. She had spent most of her life out of Gloria's care and was attached to her grandparents.

---

[5] "Fine," Anthony said when Gloria told him she would not buy him something he asked for. "Just go do your drugs since that's what you want to do."

[6] Caden C. by contrast "grew distressed at the prospect of not living with his mother." (*Caden C., supra,* 11 Cal.5th at p. 627.)

The court correctly held that Gloria's evidence was insufficient to support this element of the parental benefit exception to termination. (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 468; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) She had to show "a substantial, positive, emotional attachment . . . implying that the child would benefit from continuing the relationship," based on "how children feel about, interact with, look to, or talk about" her. (*Caden C., supra,* 11 Cal.5th at pp. 632, 636.) "A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability. . . . [A]n emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's [*sic*] interactions with the parent were not ambivalent, detached, or indifferent." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 2030.)

Gloria failed to make this showing with uncontradicted and unimpeached evidence. Anthony's relationship with Gloria was ambivalent at best; Layla regarded her as a fun playmate. "Mama" and "papa" provided the children with their sense of security and stability. Gloria did not present uncontradicted evidence of an emotional attachment so substantial that it would outweigh the benefits of adoption.

## III.        Detriment

The detriment finding is based on the child's best interest. As the court explained in *Caden C.*, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Caden C., supra,* 11 Cal.5th at p. 632.)

Because Gloria failed to carry her burden to establish consistent visitation and continuing benefit to the children, we need not address in detail whether terminating the parental relationship would outweigh the benefits of adoption. Gloria's parents, who had been providing Anthony and Layla with de facto parental care for most of their lives,

11

were prepared to take the final step. In effect, clearing the way for formal adoption merely constituted official recognition of the existing situation.

## DISPOSITION

The order terminating appellant's parental rights is affirmed.


                                              BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


ZELON, J.*


*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.